# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## BRYSON CITY DIVISION
## CIVIL CASE NO. 2:12-cv-00031-MR-DLH

| | | |
|---|---|---|
| KEVIN TRACY and KATHRYN L. TRACY, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| BANK OF AMERICA, N.A., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 33].

## I.    PROCEDURAL BACKGROUND

This action arises from the Plaintiffs' purchase of Lot 42 (the "Lot") in River Rock, a planned resort community in North Carolina.  After meeting with River Rock's developer, Legasus of North Carolina, LLC ("Legasus), and picking their Lot, the Plaintiffs turned to Bank of America to finance their purchase.  Legasus failed to complete the infrastructure and amenities in River Rock and subsequently became insolvent, leaving the Plaintiffs owning land with a value significantly lower than the original purchase

price.  The Plaintiffs now bring this action against Bank of America, seeking to hold their lender legally responsible for their losses.

The Plaintiffs initially brought suit in one mass action with other borrower-plaintiffs on December 8, 2011, but the Court severed all claims. Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011). The Plaintiffs then refiled an individual Complaint.  Following the Court's Order granting in part and denying in part Bank of America's Motion to Dismiss, only Plaintiffs' claims for fraud and for violations of the Interstate Land Sales Act ("ILSA") and the North Carolina Unfair and Deceptive Trade Practices Act ("Chapter 75") remain.

Bank of America now seeks summary judgment on the Plaintiffs' remaining claims.  For the reasons that follow, the Bank's motion will be granted.

## II.    STANDARD OF REVIEW

In reviewing a party's motion for summary judgment, this Court is mindful that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the case."   N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine dispute" exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists. Id. Finally, in considering the motion for summary judgment filed by the defendant, the Court must view the pleadings and materials presented in the light most favorable to the plaintiff as the non-movant and must draw all reasonable inferences in the plaintiff's favor as well. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.   FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiffs, the following is a summary of the relevant facts.

The Plaintiffs Kevin Tracy and Kathryn L. Tracy first heard about River Rock from Mr. Tracy's brother, Jeremy Tracy, who attended a sales presentation at River Rock's grand opening in July 2006.[1]  [Doc. 33-4, Deposition of Kevin Tracy ("K. Tracy Dep.") at 20].  Jeremy informed Kevin that he had a very positive visit at River Rock and asked Kevin if he would be interested in investing.  [Id. at 25].  Later that month, Kevin contacted Legasus's agent, Mike Townsend, to discuss investing in River Rock.  [Id. at 26].  After speaking with Jeremy and Townsend,

> Kevin did his "homework," and researched [River Rock] and the area, and concluded that "this was a high-end development," and that the location, mean temperature, proximity to other major metropolitan areas were all "really good."  Additionally, he talked to people who were familiar with the area, and he received marketing reports and updates on sales projections, which were "way ahead of schedule." Additionally, Kevin discussed the purchase of the lot with his wife and with Bobby Lane, the closing coordinator.  He admittedly never visited the lots in person.

Synovus Bank v. Karp, No. 1:10-cv-00172, 2014 WL 221209, at *4 (W.D.N.C. Jan. 17, 2014) (quoting K. Tracy Dep.).

---

[1]  The Plaintiffs were not deposed in connection with this particular action. The Defendant obtained publicly filed portions of Mr. Tracy's deposition testimony relating to his River Rock purchases from his litigation with the National Bank of South Carolina.  See Nat'l Bank of S.C. v. Tracy, Civil Case No. 1:10-cv-00202, Doc. 86-7 (W.D.N.C.). This testimony is admissible non-hearsay as an admission by a party-opponent pursuant to Rule 801(d)(2) of the Federal Rules of Evidence.

Mr. Tracy purchased Lot 11 from Legasus, entering into a Purchase Agreement with an effective date of October 12, 2006. [Doc. 33-5, Purchase Agreement for Lot 11]. Mr. Tracy financed the lot purchase with National Bank of South Carolina ("NBSC"), and closed on the purchase on or about December 14, 2006. [Doc. 33-6, NBSC Deed of Trust for Lot 11]. In June 2010, NBSC sued Mr. Tracy in Buncombe County, North Carolina for breach of the loan agreement. Nat'l Bank of South Carolina v. Tracy, No. 1:10-cv-00202, Doc. 1-1 (W.D.N.C. filed Sept. 15, 2010). The Plaintiff removed the action to this Court and filed counterclaims against NBSC for violations of the Interstate Land Sales Act, the Unfair and Deceptive Trade Practices Act, fraud, fraud in the inducement, violations of the Mortgage Lending Act, and negligent misrepresentation. [Id., Doc. 10, Counterclaims].

Mr. Tracy alleged that he spoke with NBSC's mortgage loan officer, Michael Wolf, prior to entering into his purchase agreement and that he was induced into purchasing the lot based on Mr. Wolf's misrepresentations and

NBSC's inflated appraisals. [See id.]. Specifically, Mr. Tracy contended that Wolf reiterated on a number of occasions that the lot was a great

investment and that if Mr. Tracy did not buy the lot that someone else would.  <u>Karp</u>, 2014

221209, at *5.  They also discussed that Mr. Tracy intended to purchase the lot as an investment and resell the lot before the loan matured.  <u>Id.</u> Prior to closing, Mr. Tracy asked Wolf for a copy of the appraisal, but did not receive a copy.  <u>Id.</u> at 20.

On January 17, 2014, this Court issued an order granting summary judgment in favor of NBSC on all of Mr. Tracy's claims, and dismissed Mr. Tracy's counterclaims.  <u>See generally</u> <u>Karp</u>, 2014 WL 221209.

The Plaintiffs allege that Mr. Tracy contacted Bank of America mortgage loan officer Gail Parker in August 2006 to request financing pre-approval because he was planning to purchase another lot in River Rock: Lot 42.  [Doc. 33-7, Plaintiffs' Responses to Interrogatories No. 6].  Mr. Tracy had several conversations with Parker regarding the Bank's financing options and interest rates.  [<u>Id.</u>].  The Plaintiffs also allege that Parker told Mr. Tracy: (1) "that buying in River Rock was a great opportunity because of the fact it was high-end and prices would rise much more steeply than in most communities"; (2) "that River Rock was in great demand and as the community progressed the prices would continue to rise, so it was a wonderful investment opportunity"; (3) "that since Mr. Tracy was buying a

lot in the first few months that sales opened, prices were still discounted and the financing incentives were very good"; (4) "that if he did not buy Lot 42, that someone else would"; and (5) that he would be able to resell the Lot. [Doc. 1, Complaint at ¶¶ 62, 64, 65, 67].  Parker also told Mr. Tracy that interest rates were actually lower than previously quoted and encouraged him to lock in on the NetFive Option, which was the Bank's best offer; that the NetFive Option would not be available in the near future; that selling lots in River Rock was not a problem now and would never be a problem in the future so that interest only payments would not be an issue when both principal and interest payments would otherwise be required; that the developer had sold twice the number of reservation certificates as the number of lots available; that buyers were waiting for the next lot phase release; that the Tracys were buying at a great price and would not have to wait to get out of the loan because the developer had a good resale team; that sales representatives were getting bonuses on resales so they were motivated to sell them; and that River Rock was an excellent investment. Doc. 35-2, Plaintiffs' Rule 26 Initial Disclosures at 2-3].

Mr. Tracy signed a Purchase Agreement for Lot 42 on October 12, 2006.  [Doc. 33-8, Purchase Agreement for Lot 42].  Bank of America is not a signatory to the Purchase Agreement.  [Id.; Doc. 33-3, Plaintiffs'

Responses to Requests for Admission Nos. 7-8]. The Purchase Agreement specifically disclaims that Mr. Tracy will obtain any economic benefit from the Lot purchase. [Doc. 33-8, Purchase Agreement at ¶ 23]. The Plaintiffs admit that, prior to entering into the Purchase Agreement, they did not obtain an appraisal of the Lot or even visit River Rock. [Doc. 33-4, K. Tracy Dep. at 76, 100; Doc. 33-3, Plaintiffs' Responses to Requests for Admission Nos. 5-6, 12-13]. The Plaintiffs admit that Bank of America never prevented them from visiting the Lot. [Doc. 33-3, Plaintiffs' Responses to Requests for Admission No. 18]. The Plaintiffs claim that they "relied on the bank as a lending professional and the appraisal they secured to verify the value of the

land." [Id. at No. 4].

On or about December 15, 2006, Mr. Tracy executed a note in the amount of $400,000.00 to fund the purchase of the Lot. [Doc. 33-9, Adjustable Rate Note]. Ms. Tracy is not a signatory to the Note, but she executed the Deed of Trust securing the Lot in favor of Bank of America. [Doc. 33-10, Deed of Trust]. The Plaintiffs executed the loan closing documents in Maryland, where they both reside. [See Doc. 33-9, Note; Doc. 33-10, Deed of Trust; Doc. 33-7, Plaintiffs' Responses to Interrogatories No. 7].

In August 2008, River Rock borrowers expressed concern with the progress of the development, discussed their potential legal claims, such as those under the Interstate Land Sales Act, and began meeting with attorneys regarding their legal options and preserving documents in an Intranet Management system. [Doc. 33-11, August 2008 River Rock E-mail].

As previously noted, the Plaintiffs initiated the present suit as part of a mass action with other borrower-plaintiffs on December 8, 2011. Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011).

## IV. DISCUSSION

### A. Statute of Limitations

In the present case, the Plaintiffs assert claims for fraud, violations of Chapter 75, and violations of ILSA. Under North Carolina law, the statute of limitations applicable to fraud claims is three years. See N.C. Gen. Stat. § 1-52(9). This three-year statute of limitations begins to run "from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence." Hunter v. Guardian Life Ins. Co., 162 N.C. App. 477, 485, 593 S.E.2d 595, 601, disc. rev. denied, 358 N.C. 543, 599 S.E.2d 48 (2004) (citation omitted).

Claims under Chapter 75 are subject to a four-year statute of limitations. <u>See</u> N.C. Gen. Stat. § 75-16.2. While a Chapter 75 claim generally accrues when the violation of the statute occurs, <u>see</u> <u>Jones v. Asheville Radiological Group, PA</u>, 134 N.C. App. 520, 527, 518 S.E.2d 528, 533 (1999), <u>rev'd in part on other grounds</u>, 351 N.C. 348, 524 S.E.2d 804 (2000), where the claim is based on fraudulent conduct, courts have determined that the cause of action arises at the time that the fraudulent conduct was discovered or should have been discovered with the exercise of due diligence. <u>See, e.g.,</u> <u>Faircloth v. Nat'l Home Loan Corp.</u>, 313 F.Supp.2d 544, 553-54 (M.D.N.C. 2003), <u>aff'd</u>, 87 F. App'x 314 (2004).

Finally, ILSA claims are subject to a three-year statute of limitations. <u>See</u> 15 U.S.C. § 1711. The accrual date of an ILSA claim, however, depends on the particular type of claim being asserted. For example, for an alleged violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C)[2], the statute of

---

[2] Subsections (A)-(C) of § 1703(a)(2) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property:

    (A) to employ any device, scheme, or artifice to defraud;

    (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent

10

limitations expires "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2). The statute of limitations for an alleged violation of § 1702(a)(2)(D)[3] expires three years after the date of signing of the contract of sale. See 15 U.S.C. § 1711(a)(1). This limitations period, however, may be subject to equitable tolling if the plaintiffs can demonstrate "(1) that they exercised due diligence to discover their cause of action before the limitations period ran; and (2) that the defendant committed an affirmative act of fraudulent concealment to frustrate discovery despite due diligence." Orsi v. Kirkwood, 999 F.2d 86, 89 (4th Cir. 1993); Lukenas v. Bryce's Mountain Resorts, Inc., 538 F.2d 594, 597 (4th Cir. 1976); Dexter v. Lake Creek Corp., No. 7:10-CV-226-D, 2013 WL 1898381, at *4 (E.D.N.C. May 7, 2013).

---

to the lot or subdivision; [or]

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser[.]

15 U.S.C. § 1703(a)(2)(A)-(C).

[3] Section 1703(a)(2)(D) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property, "to represent that roads, sewer, water, gas, or electric service or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed." 15 U.S.C. § 1703(a)(2)(D).

Generally, under North Carolina law, the issue of "when fraud should be discovered in the exercise of reasonable diligence is a question of fact for the jury." State Farm Fire and Cas. Co. v. Darsie, 161 N.C. App. 542, 548 S.E.2d 391, 397 (2003). Where, however, "the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of reasonable diligence is established as a matter of law." Drinkard v. Walnut Street Sec., Inc., No. 3:09-cv-66-FDW, 2009 WL 1322591, at *2 (W.D.N.C. May 11, 2009) (citation omitted).

Here, viewing the forecast of evidence in the light most favorable to the Plaintiffs, the Court concludes that the undisputed forecast of evidence demonstrates that the Plaintiffs' claims are time barred. The Plaintiffs executed the Purchase Agreement for the Lot on October 12, 2006, and took possession upon closing on December 15, 2006. While the Plaintiffs began to have "concerns" about the development in 2008, they have failed to present a forecast of evidence that they did *anything* in the interim period of 2006 to 2008 to discover their causes of action against the Bank, nor have they shown that the Bank committed any affirmative act of fraudulent concealment to frustrate discovery despite their due diligence.

For all of these reasons, the Court concludes that the Plaintiff's claims are time-barred.

**B.    ILSA Claim**

Even assuming that the Plaintiffs' claims are not time-barred, the Plaintiffs' claims under the ILSA are also subject to dismissal because the Plaintiffs have failed to present a forecast of evidence that Bank of America is a "developer" or "agent" within the meaning of the Act or that Bank of America engaged in a scheme to defraud the Plaintiffs during the lot purchase.

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers."  Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976).  "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property."  Burns v. Duplin Land Dev., Inc., 621 F.Supp.2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; see also Burns, 621 F.Supp.2d at 301. A "developer" is

defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. . . ." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Generally speaking, a lending institution acting in the ordinary course of its business is not considered a "developer" within the meaning of the ILSA. <u>See</u> <u>Cumberland Cap. Corp. v. Harris</u>, 621 F.2d 246, 251 (6th Cir. 1980); <u>Kenneally v. Bank of Nova Scotia</u>, 711 F.Supp.2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases); <u>Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc.</u>, 757 F. Supp. 698, 702 (W.D. Va. 1990). "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or sale of property that liability may arise under ILSA." <u>Thompson v. Bank of Am.</u>, No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

As the United States District Court for the Western District of Virginia has explained:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and

14

> good name to the sales effort. It is participating to an unacceptable degree in the marketing of the project. It has gone beyond its function as a commercial bank to lot purchasers.

Hammar, 757 F. Supp. at 702-03.

The Fourth Circuit recently reached a similar conclusion, holding that the anti-fraud provision of the ILSA "encompasses entities that participated in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." In re Total Realty Mgmt., LLC, 706 F.3d 245, 253 (4th Cir. 2013) (finding complaint stated plausible allegations to support ILSA claim where it was alleged that marketer's representatives spoke at developer's sales seminars and disseminated its marketing materials there as well as on the developer's website).

Here, the undisputed forecast of evidence demonstrates that the Bank was not a co-developer with or agent of Legasus. Bank of America provided no funding for the River Rock development. [Doc. 33-12, Affidavit of Jonathan Rainey ("Rainey Aff.") at ¶ 6]. Further, Bank of America did not sell the lot to the Plaintiffs and was not a party to the Purchase Agreement.

To the extent that the Plaintiffs contend that the Bank engaged in marketing activities on behalf of the developer, the Plaintiffs have failed to

present a forecast of evidence that the alleged representations went beyond the ordinary course of dealing with a bank selling loan products to interested customers. In fact, the Plaintiffs have not presented any forecast of evidence that Bank of America engaged in any marketing of *River Rock*, as opposed to the loan products it offered to River Rock purchasers.

The Plaintiffs also argue that because they never received a HUD property report from Legasus, as required by the ILSA, they had the right to rescind the Purchase Agreement. The Plaintiffs contend that Parker's alleged misrepresentations somehow prevented them from subsequently rescinding their Purchase Agreement within the statutory two-year period. See 15 U.S.C. § 1703(c). Notably, the Plaintiffs do not allege such a claim in their Complaint regarding a violation of the ILSA, 15 U.S.C. § 1703(a)(1)(B). Notwithstanding such argument, however, the Plaintiffs have not presented any forecast of evidence that the Bank was aware that the Plaintiffs had not received a Property Report or that it misrepresented any material facts in order to induce the Plaintiffs to refrain from rescinding the purchase agreement on this basis. In any event, this argument is belied by the Defendant's forecast of evidence that the Plaintiffs received a copy of the Property Report on November 12, 2006, after executing the Purchase Agreement. [Doc. 36-3]. Accordingly, to the extent that the

Plaintiffs attempt to argue that the Bank induced them to forego a statutory right to revoke the Purchase Agreement, this argument fails.

For all of these reasons, the Court concludes that the Bank was not a "developer" or "agent" of River Rock within the meaning of the ILSA. Accordingly, the Plaintiffs' claims under the ILSA are dismissed.

### C.    Fraud Claim

In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party.   Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007).   Additionally, the party must demonstrate any reliance on the false representations was reasonable.   See id.  "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate."   Cobb v. Penn. Life Ins. Co., 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011).

The conversations the Plaintiffs had with Parker in the course of securing financing for their lot purchase do not support a claim of fraud. First, most of Parker's representations amount to nothing more than expressions of opinions regarding the value or quality of the property as a

potential investment. "A representation which is nothing more than an opinion as to the value of property, absent something more, does not constitute actionable fraud." Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984). North Carolina law recognizes an exception to the general rule that statements of opinion are not actionable "if, at the time [the statement of opinion] is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwich v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999). The Plaintiffs, however, have failed to present a forecast of evidence that Parker made any of the aforementioned statements while holding a contrary opinion.

To the extent that the Plaintiffs claim to have been misled by Parker's representations regarding the high demand for River Rock lots (or North Carolina land in general), the Plaintiffs have failed to present a forecast of evidence that such statements were actually false. Furthermore, to the extent that the Plaintiffs claim to have been misled by Parker's representations that the lot would increase in value over time and that they would be able to re-sell their lot before the loan period expired, such representations "'are not regarded as fraudulent in law,' since they are not

misrepresentations of a 'subsisting fact.'" Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 530 (E.D.N.C. 1985) (citation omitted).

Even if any of Parker's statements were actionable, no reasonable fact-finder could infer from the forecast of evidence that the Plaintiffs' reliance on such statements was reasonable.  "North Carolina courts consistently have held that exaggerated representations by a seller as to property's value are mere 'puffery' on which a buyer is not entitled to rely." Stephen Dilger, Inc. v. Meads, No. 5:11–CV–42–FL, 2011 WL 1882512, at *7 (E.D.N.C. May 17, 2011) (citing Horton v. Humble Oil & Refining Co., 255 N.C. 675, 680, 122 S.E.2d 716, 720 (1961) ("Representations which merely amount to a statement of opinion go for nothing. One who relies on such affirmations made by a person whose interest might prompt him to invest the property with exaggerated value does so at his peril, and must take the consequences of his own imprudence.")).

As the Fourth Circuit has noted, reliance on "booster statements" of "enthusiastic agents" is unreasonable because such statements "are to be expected."  See Glaser v. Enzo Biochem, Inc., 126 F. App'x 593, 603 (4th Cir. 2005) (citation omitted) (Wilkinson, C.J., concurring in part and dissenting in part).  At bottom, Parker was engaged in the marketing of one thing: the Bank's financial services. That she appeared to affirm and

approve of the Plaintiffs' decision to purchase in River Rock does not change this fact.

Further, it was unreasonable for the Plaintiffs to rely on Parker's opinions when the Purchase Agreement expressly disclaimed any potential economic benefit to the Plaintiffs. [Purchase Agreement, Doc. 33-8 at ¶ 23 ("The Purchaser acknowledges and agrees that the Seller has not promised, suggested, or indicated in any way that the Purchaser will receive any economic benefit whatsoever as a result of the Purchaser's ownership of the Lot, and Seller does hereby disclaim any such promise, suggestion or indication made by any person whatsoever.")].

Finally, the Plaintiffs' claim of reliance is unjustified because they had ample opportunity to conduct an independent investigation of the property and reach their own conclusions about the development and its risks prior to purchasing the property but failed to do so. As the North Carolina Court of Appeals has explained:

> In cases involving the purchase of real property, "[r]eliance is not reasonable if a plaintiff fails to make any independent investigation" unless the plaintiff can demonstrate: (1) "it was denied the opportunity to investigate the property," (2) it "could not discover the truth about the property's condition by exercise of reasonable diligence," or (3) "it was induced to forego additional investigation by the defendant's misrepresentations."

<u>Sunset Beach Dev., LLC v. AMEC, Inc.</u>, 196 N.C. App. 202, 209, 675 S.E.2d 46, 52 (2009) (quoting <u>RD & J Properties v. Lauralea–Dilton Enters., LLC</u>, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004)).  Here, the parties were engaged in an arm's length transaction.  The Plaintiffs were sophisticated investors, seeking to "flip" the property in a relatively short period of time for a profit.  Significantly, the Plaintiffs have not presented a forecast of evidence to suggest that the Bank denied them the opportunity to inspect the property or that they were otherwise induced to forego additional investigation as a result of Parker's representations.

In this respect, this case is easily distinguishable from <u>Phelps-Dickson Builders, L.L.C. v. Amerimann Partners</u>, 172 N.C. App. 427, 617 S.E.2d 664 (2005), a case relied on by the Plaintiffs.  In that case, the plaintiff, a builder, entered into a contract with the defendant, a developer, to buy lots and build model homes based on the developer's representations about there being solid contracts to purchase lots in the subdivision, presales, and eager buyers.  <u>Id.</u> at 429, 617 S.E.2d at 666. When those representations turned out to be false, the builder sued, asserting, among other things, claims of fraud and unfair and deceptive trade practices.  <u>Id.</u> at 432, 617 S.E.2d at 667. The trial court granted the

developer summary judgment, but the Court of Appeals reversed. In so holding, the Court of Appeals concluded that there was a genuine issue of fact as to whether the builder's reliance was reasonable because the builder had an inferior opportunity to investigate the developer's representations as that information was exclusively in the control of the developer and could not otherwise be readily or easily verified. Id. at 437-39, 617 S.E.2d at 670-71.

By contrast, in the present case, the Plaintiffs have failed to present any forecast of evidence to establish that the Bank held any superior knowledge regarding the wisdom of investing in the undeveloped lots in River Rock. Moreover, the Plaintiffs have failed to present anything to indicate that information regarding the development was exclusively in the control of the Bank and could not have been readily verified by the Plaintiffs. Indeed, the Plaintiffs had many means available to them to assess the value and condition of the property at issue, including independent appraisals, comparable sales data, and personal inspections of the property. The Plaintiffs, however, chose to forego any independent investigation of their investment prior to purchase. Under these circumstances, the Bank cannot be held liable for the Plaintiff's failure to conduct their own due diligence.

Further, the Plaintiffs' asserted reliance was unjustified because their relationship with the Bank was contractual and did not give rise to a fiduciary duty to ensure that the Plaintiff was making a sound investment. See In re Fifth Third Bank, Nat'l Ass'n–Village of Penland Litig., 217 N.C. App. 199, 212, 719 S.E.2d 171, 180 (N.C. Ct. App. 2011) (noting that borrowers "cited no authority tending to establish that [the lender] had a legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to [the borrowers] the results of any such investigation or any other deficiencies associated with the [development]."), cert. denied, 731 S.E.2d 687 (2012); Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party").[4]

For all of these reasons, the Court concludes that the Bank is entitled to summary judgment on the Plaintiffs' fraud claim.

**D. Chapter 75 Claim**

---

[4] To the extent that the Plaintiffs base their fraud claim on the Bank's use of allegedly inflated appraisals, the Plaintiffs have not presented any forecast of evidence to suggest that the Bank had any knowledge that the appraisals were incorrect or false in any way. Moreover, the Plaintiffs have offered no forecast of evidence that they relied on these appraisals in purchasing their property. Indeed, neither of the Plaintiffs even saw an appraisal before entering into the purchase agreement.

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). A deceptive practice is one that has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required." Id. at 461, 400 S.E.2d at 482.

To the extent that the Plaintiffs' Chapter 75 claim is derivative of their claims for fraud and violations of the ILSA, such claim also fails for the reasons set forth above. See SilverDeer, LLC v. Berton, No. 11 CVS 3539, 2013 WL 1792524, at *10 (N.C. Super. Ct. Apr. 24, 2013) (citing Governor's Club, Inc. v. Governors Club Ltd. P'ship, 152 N.C. App. 240, 255, 567 S.E.2d 781 (2002)).

The Plaintiffs contend that the Bank violated Chapter 75 by "align[ing] itself with the developer, promoting River Rock as an investment, and creating loan programs around it." [Doc. 35 at 20]. The Plaintiffs' assertions that the Bank should be held liable for its close association with Legasus, however, are insufficient to state a claim under Chapter 75 absent a forecast of evidence that the Bank was an actual or apparent

agent of the developer.  See In re Fifth Third Bank, 217 N.C. App. at 211-12, 719 S.E.2d at 179-80 (dismissing Chapter 75 claim based on allegations that lender "gave an air of legitimacy to the Penland development by virtue of its involvement in the developers' lot sales program" and that lender clearly "had an agreement or working relationship with the developers with respect to the Penland lot loans.").

The Plaintiffs appear to have abandoned their Chapter 75 claim to the extent that such claim was based on a theory that the use of inflated appraisals by the Bank as part of its loan underwriting process constitutes an unfair or deceptive trade practice.  Even if the Plaintiffs were to pursue this theory, however, their claims would nevertheless be subject to dismissal as the undisputed forecast of evidence demonstrates that the Plaintiffs did not even see an appraisal prior to closing and, in any event, their Purchase Agreement was not dependent on such appraisal.  As such, the Plaintiffs could not have reasonably relied on the appraisal in proceeding with their lot purchase.  See In re Fifth Third Bank, 217 N.C. App. at 211, 719 S.E.2d at 179 ("Thus, given the complete absence of any evidence tending to show a causal connection between the allegedly defective appraisals and the injury that Plaintiffs claim to have suffered, we

conclude that the allegedly defective appraisals do not support a finding of liability pursuant to [Chapter 75].").

Finally, the Plaintiffs cannot establish an unfair or deceptive act based on the Bank's ostensible failure to prevent them from finalizing their lot purchase during the origination and underwriting process. The Bank's role in this transaction was to provide financing; it had no contractual duties to the Plaintiffs outside of that role. See Camp, 133 N.C. App. at 560, 515 S.E.2d at 913. The Bank had no obligation to advise the Plaintiffs regarding the quality of the investment for which they sought financing. See In re Fifth Third Bank, 217 N.C. App. at 213, 719 S.E.2d at 180 (noting that lender has no "legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to Plaintiffs . . . any other deficiencies associated with the [development]").[5]

In sum, the Plaintiffs have not presented any forecast of evidence establishing that the Bank committed any unfair or deceptive action during the Plaintiffs' lot purchase. Accordingly, the Court concludes that the Bank is entitled to summary judgment on the Plaintiffs' claim under Chapter 75.

---

[5] Because the Court concludes that the Plaintiffs' Chapter 75 claim should be dismissed on the merits, the Court need not address the Bank's argument that the Plaintiffs' place of residence outside of the State of North Carolina precludes their recovery under Chapter 75.

## V.    CONCLUSION

For the foregoing reasons, the Court finds that there are no genuine disputes of any material fact and that the Defendant is entitled to judgment as a matter of law.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 33] is **GRANTED**, and this action is hereby **DISMISSED**.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Martin Reidinger
United States District Judge